655 P.2d 895

George K. SHEPPARD, Plaintiff-Respondent, and Cross-Appellant,

v.

Roma SHEPPARD, Defendant-Appellant, and Cross-Respondent.

No. 13272.

Supreme Court of Idaho.

Dec. 16, 1982.

**4**

Dwight R. Bowen, Idaho Falls, *for de*-fendant-appellant, and cross-respondent.

Archie W. Service, of Green, Service, Gasser & Kerl, Pocatello, for plaintiff-respondent, and cross-appellant.

Larry J. Echohawk, Salt Lake City, Utah, John Traylor, Fort Hall, for Shoshone-Bannock Tribes, amicus curiae.

SHEPARD, Justice.

This is an appeal from a decision of the district court which in turn had affirmed in part and reversed in part a decree of divorce entered by a magistrate court. The decree of the magistrate court ordered the parties divorced, ordered child support and custody arrangements for the three natural children of the parties, held that a purported adoption of a fourth child was invalid, held that certain real and personal property was the community property of the parties, valued the community property, ordered its distribution as between the parties, and because of the great bulk of the property being distributed to one party, ordered an offsetting monetary award to the other party payable over a number of years. Upon appeal, the district court overturned the magistrate court's ruling regarding the invalidity of the adoption of the fourth child and reversed the magistrate court's order permitting the offsetting financial award to be paid over a number of years and required such to be paid immediately, but in all other respects the district court affirmed the decree of the magistrate court. On appeal to this Court, we affirm the district court in all respects.

The principal question presented on this appeal is, we are informed, one of first impression in this and evidently any other jurisdiction, *i.e.*, the jurisdiction of a state court over a divorce action where one of the parties is an Indian and the other party a non-Indian, and the extent to which a state court may adjudicate the status of real and/or personal property as being the community property of the parties, and the authority of such a court to either divide that community property between the parties or make an offsetting financial award in lieu of an actual division of the community property.

The facts of the instant case are relatively simple, but the legal questions that flow therefrom are complex. Defendant-appellant and cross-respondent Roma Sheppard is an Indian and an enrolled member of the Shoshone-Bannock Tribes. Plaintiff-respondent and cross-appellant George Sheppard is a non-Indian. Roma Sheppard is and evidently has been for several years employed by the Bureau of Indian Affairs, earns between $12,000 and $14,000 per year in that position, and also receives approximately $2,500 in other income. George Sheppard is a member of the faculty at Idaho State University and his only source of income is his salary of approximately $16,000 per year.

The parties were married in 1959 and three children were born of the marriage. As of the date of the original divorce decree (June, 1978), those children were 17, 16 and 13 years of age. In addition, a child, six years old at the time of the decree (the natural grandson of Roma Sheppard through a previous marriage) was allegedly adopted by the parties in the Shoshone-Bannock tribal court in 1971.

The parties, during a large part of the marriage, resided within the boundaries of the Fort Hall Shoshone-Bannock Reservation, but at some point in time the parties owned and lived in a residence in Pocatello, Idaho, outside the boundaries of the reservation. During the time of the marriage

real and personal property was accumulated. Several airplanes were purchased and sold during those years and the Sheppards owned one at the time of the divorce. At the time of the divorce, several motor vehicles were owned by the parties. Household goods and furnishings were accumulated and were in existence at the time of the divorce. Although the record is not totally clear, apparently the parties, largely through their own labor, constructed a residence upon property located within the reservation boundaries and owned by the father of Roma Sheppard.[1] Also acquired were two parcels of grazing land, one of 20 acres and the other of 37.99 acres, both of which were located within the boundaries of the Fort Hall Indian Reservation, and the title to which was held in the name of Roma Sheppard. Ownership of the latter parcel consisted only of a percentage of the overall title. It is unclear from the record whether those parcels consisted of "trust" property or whether they were "allotments" subject to restrictions on alienation. The parties also accumulated during the course of the marriage a somewhat substantial cattle operation, i.e., stock, ranch implements and other personalty. That cattle operation was conducted on grazing lands within the boundaries of the Fort Hall Reservation.

## I.

## PROCEEDINGS BELOW

In July, 1977, George Sheppard brought this action for divorce. He alleged that three children were born of the marriage, indicated that their custody should be awarded to the defendant Roma Sheppard, and conceded that he should be required to pay child support. He alleged the above

mentioned real and personal property was community and prayed for a division thereof in kind.

Roma Sheppard thereafter answered and counterclaimed. She alleged the existence of a fourth child by adoption, Michael Blackhawk Sheppard, and prayed for his custody and child support. Her allegations of community property included much of the property, alleged to be community property George Sheppard had, including the family home, but only 50 head of cattle and none of the grazing lands. She also alleged the existence of approximately $10,000 in community indebtedness which was secured by the livestock. She alleged the existence of certain of her separate property acquired by virtue of gifts, privileges and rights based upon her membership in the Shoshone-Bannock Tribes. She prayed that the divorce be granted, that custody of and child support for the children be decreed, and that the community property of the parties be divided subject to encumbrances thereon.

Following trial before the magistrate court, that court entered its memorandum decision, findings of fact and conclusions of law (later amended) and decree of divorce. The magistrate court awarded Roma Sheppard custody of and child support for the three natural children of the parties. As to the fourth, allegedly adopted, child, the magistrate court held that the adoption proceedings regarding that fourth child in the tribal court were deficient and that such alleged adoption was void.

The magistrate court held correctly that property acquired during the existence of the marriage is presumed to be community. The court held that even assuming the provisions of 25 U.S.C. § 194 were controlling, plaintiff George Sheppard had overcome

---

1. The record reflects that this house is built on land which is assigned in trust to Roma Sheppard's father and which will revert to the tribe upon his death. In their respective pleadings both parties alleged that this house was their community property. At no time during the proceedings below has it been alleged that the house is attached to the land as real property. Cf. Bryan v. Itasca County, 426 U.S. 373, 382, 96 S.Ct. 2102, 2107, 48 L.Ed.2d 710 (1976) (mo-

bile home located on trust land, but no argument made that it had become part of the realty and hence treated as personal property). Here both parties contemplated that the house be moved to another location if and when it became necessary, and the valuation of this property below was based upon its value after making the necessary move away from Roma Sheppard's father's land.

any presumption granted the defendant by said section 194.

As to the real property, the court found that the 20-acre tract, a complete undivided ownership, was held in trust for Roma Sheppard and that the consideration paid therefor was $2,250. As to the remaining tract of approximately 38 acres, the court found that it had been purchased by the parties for the sum of $2,641, and consisted of an approximately $^{27}/_{30}$th ownership. At trial, an expert witness had testified that said property had a value of approximately $500 per acre. The magistrate judge specifically refused to adopt that valuation because of the limitations on the transfer of ownership. Rather, he held that since community property funds of $4,891 were expended in the purchase of that property, George Sheppard should be reimbursed the sum of $2,445, i.e., one-half of the community contribution.

As to the cattle operation, the magistrate court meticulously traced the moneys invested therein. The court found that the parties had liquidated community property stocks and bonds (which had evidently resulted from the sale of the parties' Pocatello residence) and placed the $14,000 proceeds in the cattle operation. The court found that the parties had procured a $23,000 loan from an "Indian lending agency," evidently available only because of Roma Sheppard's tribal membership, and invested it in the cattle operation. Both parties were signatory to and liable on that loan transaction. The court found that another $8,000 had been invested in the cattle operation, representing $2,000 of claims settlement moneys for each of the four children. The court also found that another $2,000 had been invested in the cattle operation, representing Roma Sheppard's claim settlement moneys. As to that latter amount, the court held that on the evidence, it could not be established how or if that $2,000 was traced into the cattle operation.

The court, consequently, held that all moneys with the exception of the claims money of the children, had been commingled into the cattle operation and were im-

possible to trace and, therefore, that the cattle operation was community property. The court then awarded the children the value of their initial investment in the cattle operation with a return of eight per cent per annum thereon. The court concluded that since the cattle operation was awarded to Roma Sheppard, she could either liquidate and pay the children's interests or allow their shares to remain therein and draw interest thereon at eight per cent per annum, and that the said children's interest would be secured by a lien upon the cattle operation.

The trial court meticulously valued each and every item which it had found to be community property (down to and including two winter coats at $100 and a pair of reading glasses at $75). It found that the cattle operation, less the encumbrance and less the children's share, was of a net value of $49,847, and, therefore, valued each party's share at $24,923. The court found that the community interests in farm equipment and supplies had a value of $9,648.

As to the remaining items of community property, the court found that plaintiff was in possession of items of a value of $8,975 (the main item therein being the airplane at a value of $8,250), and that the defendant Roma Sheppard was in possession of household property with a value of $19,217 (the principal item therein being the house at $16,500), and other property with a value of $61,187.13 (the principal items therein being the cattle valued at $49,847.69).

The court, in essence, awarded each party the properties then in their possession, the effect of which was to distribute to the defendant Roma Sheppard all the real property, many of the household goods, the cattle operation and the farm equipment and supplies, and made an offsetting award requiring defendant Roma Sheppard to pay to plaintiff George Sheppard $35,714.56.

An appeal was taken from the magistrate court's decree of divorce to the district court.

The district court, as to the adoption question, held that in the tribal court there had been substantial compliance with tribal

procedure and that because of his actions, George Sheppard was estopped to challenge the validity of the proceedings. Hence the district court ordered the cause remanded to the magistrate court for a determination of appropriate child support for the adopted child. As to the property division question, the district court upheld that portion of the magistrate court order, but also held that the compensating award to George Sheppard should be paid in a lump sum rather than in periodic payments. In other respects the order of the magistrate court was affirmed.

On appeal here, both appellant and respondent assert error in certain factual findings made by the lower courts and assert that certain decisions of the lower courts constitute abuses of discretion. We find ample support in the record for the factual findings, and they will not be disturbed on appeal. We further hold that under the unique circumstances of this case, there was no abuse of discretion. Therefore, the only significant issues on this appeal are whether the district court erred in reversing the magistrate court's decision relating to the invalidity of the adoption, and whether the district court erred in affirming the magistrate court's division of the property and the offsetting award made in connection therewith. As to both issues, we affirm the decision of the district court.

## II.

### THE ADOPTION

We turn first to the validity of the adoption. The magistrate found that the adoption proceedings before the tribal court did not conform to the procedural requirements of the tribal code and held the adoption void. The district court reversed that portion of the magistrate's decision, holding that substantial compliance with tribal procedural requirements had been satisfied and George Sheppard was estopped to challenge the decree. We affirm, however, on other grounds.

■ Where an order of a lower court is correct, albeit based on a different theory than that found to be dispositive by this Court, the lower court order will be affirmed. *Southern Idaho Realty v. Hellhake and Associates, Inc.*, 102 Idaho 613, 636 P.2d 168 (1981); *Matter of Revello*, 100 Idaho 829, 606 P.2d 933 (1979); *Robison v. Compton*, 97 Idaho 615, 549 P.2d 274 (1976); *City of Weippe v. Yarno*, 96 Idaho 319, 528 P.2d 201 (1974). We do not reach the merits of the district court's holdings of substantial compliance with the tribal court procedures or estoppel. We find the question of the tribal court jurisdiction to be dispositive. That issue was argued before and considered by the district court.

■ In effect George Sheppard attempts to mount a collateral attack on the tribal court decree of adoption. A final judgment entered by a court of competent jurisdiction is presumed valid and therefore the party asserting the invalidity of the judgment must carry the burden of proof sufficient to overcome the presumption. *Clear v. Marvin*, 86 Idaho 87, 92, 383 P.2d 346, 349 (1963); *accord, American Security Bank v. Read Realty, Inc.*, 616 P.2d 237 (Haw.App.1980); *Walsh v. Ellingson Agency*, 613 P.2d 1381 (Mont.1980). Tribal court decrees, while not precisely equivalent to decrees of the courts of sister states, are nevertheless entitled to full faith and credit. The full faith and credit clause of the United States Constitution provides that each state shall give full faith and credit to the "judicial proceedings of every other state" and that Congress may pass general laws to implement this clause. U.S.Const. art. 4, § 1. In response, Congress passed 28 U.S.C. § 1738, which states in pertinent part:

"Such ... judicial proceedings ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."

The issue, then, is whether Indian tribes are, for the purpose of 28 U.S.C. § 1738, either "Territories" or "Possessions."

In the case of *United States ex rel Mackey v. Cox,* 59 U.S. (18 How.) 100 (1856), a Cherokee probate court had granted letters of administration on the estate of a deceased tribal member and it was held that the federal courts of the District of Columbia were required to recognize those letters of administration as valid. The Court also stated, in discussing the differences between Indian territories and territories organized to eventually achieve statehood, that:

> "This, however, is no reason why the laws and proceedings of the Cherokee territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other territories in the Union. It is not a foreign, but a *domestic territory,*—a territory which originated under our constitution and laws." *Id.* at 103 (emphasis added).

More recently the Supreme Court has indicated, citing *Cox* with approval, that full faith and credit analysis is appropriately applied to tribal courts. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 65–66 n. 21, 98 S.Ct. 1670, 1680–1681 n. 21, 56 L.Ed.2d 106 (1978). Consequently, we agree with those courts which have found the phrase "Territories and Possessions" broad enough to include Indian tribes, at least as they are presently constituted under the laws of the United States. *Jim v. CIT Financial Services,* 87 N.M. 362, 533 P.2d 751 (1975); *In re Adoption of Buehl,* 87 Wash.2d 649, 555 P.2d 1334 (1976); *Raymond v. Raymond,* 83 F. 721 (8th Cir.1897); *but see Brown v. Babbit Ford, Inc.,* 117 Ariz. 192, 571 P.2d 689 (Ariz.App.1977) (tribal decrees entitled to comity but not full faith and credit); *In re Marriage of Red Fox,* 23 Or.App. 393, 542 P.2d 918 (1975). *See generally* Ragsdale,

*Problems in the Application of Full Faith and Credit for Indian Tribes,* 7 N.M.L.Rev. 133 (1977); Comment, *Conflicts Between State and Tribal Law: The Application of Full Faith and Credit Legislation to Indian Tribes,* 1981 Ariz.St.L.J. 801 (1981). We believe that this holding will facilitate better relations between the courts of this state and the various tribal courts within Idaho.[2]

One ground for successfully challenging the judgments of the courts of another state is to show that the court lacked subject matter jurisdiction. Full faith and credit is not to be accorded a decree of a court which lacked subject matter jurisdiction. *Sierra Life Ins. Co. v. Granata,* 99 Idaho 624, 586 P.2d 1068 (1978); *Newell v. Newell,* 77 Idaho 355, 293 P.2d 663 (1956). George Sheppard asserts that the tribal court had no jurisdiction to approve the adoption of an Indian child by a husband and wife, one of whom is Indian and the other non-Indian. In support thereof, he cites § 2.2 of the Law and Order Code of the Shoshone-Bannock Tribe (1972), which asserts jurisdiction in civil matters only when both parties are Indian. We do not reach the issue of whether an adoption is a civil matter within the meaning of the tribal code. Rather we note that the tribal code relied upon by George Sheppard was adopted in 1972. The adoption took place in 1971, and the final decree entered therein states that it is pursuant to a tribal code approved in 1971. We are furnished no indication as to the provisions of that 1971 tribal code, and George Sheppard fails to show the extent of the tribal court's jurisdiction in 1971. Absent such evidence, he has failed to carry his burden of proving

2. It has come to the attention of this Court that, in an action related to this case, the Shoshone-Bannock appellate court, in reversing the tribal trial court, held that it was not required to give full faith and credit to the decrees of Idaho state courts. In part this decision was based on the belief that state courts did not accord tribal courts full faith and credit. As we have shown, some state courts, including this one, do. Secondly, the tribal court failed to acknowledge 28 U.S.C. § 1738, which requires *"every court within the United States"* to give full faith and credit to decrees of state courts (emphasis added). Along with this opinion extends the hope of a good working relationship between state and tribal courts, and we hope, therefore, that the Shoshone-Bannock courts will reconsider the application of full faith and credit in their proceedings. Indeed the commentators unanimously agree that tribal courts must afford other states full faith and credit. Ragsdale, *supra,* at 141; Comment, *supra,* at 818.

that the tribal court lacked subject matter jurisdiction.

It is asserted here, as the magistrate court found, that there were procedural irregularities in the adoption proceedings in the tribal court. As indicated above, there is no showing as to the 1971 procedural requirements, and hence there is no proof that the asserted procedural defects rise to the level of jurisdictional defects.

Lower courts may take judicial notice of the law of another state. *White v. White,* 94 Idaho 26, 480 P.2d 872 (1971). In *White,* judicial notice was allowed because "[m]odern communications have put the statutory compilations of other states within easy access of Idaho's courts." *Id.,* 94 Idaho at 30, 480 P.2d 872. Unfortunately, there is not the same "easy access" to the various compilations of the laws of the Shoshone-Bannock Tribes, and hence the policy behind the decision in *White* is not present in the instant case.

The order of the district court holding George Sheppard responsible for the adoptive child, Michael, is affirmed, as is the remand to the magistrate court for a determination of the proper amount of child support.

## III.

### STATE COURT JURISDICTION

We now approach the principal issue presented by this case. Roma Sheppard contends that most of the property accumulated by this couple as a result of their labor, employment and industry, solely because of its nature or location, is hers and hers alone; that George Sheppard has no interest or entitlement thereto; that the lower courts had no authority or jurisdiction to consider or act upon that property in its determination of a just division of the community property and in making the offsetting award to George Sheppard. She argues that several Congressional enactments together with decisions of the United States Supreme Court support that assertion. We disagree.

We note initially that both parties invoked the jurisdiction of the magistrate court. George Sheppard filed the action as plaintiff and Roma Sheppard answered and counterclaimed. In that counterclaim she alleged the existence of community property and prayed for its division between the parties, *i.e.,* a portion of the cattle operation, the home of the parties, the motor vehicles, airplane, and household furnishings, in short, substantially all the property of the parties excepting the two parcels of grazing land. Also indicated therein were the encumbrances existing against the listed properties.

That posture of Roma Sheppard is in direct contradiction to her argument on appeal here, wherein she asserts that the trial court had no jurisdiction to divide or even consider the residence of the parties, nor to distribute or award the cattle operation. We do not, however, dispose of this aspect of the case on the doctrine of waiver or estoppel. Rather, we consider the arguments of Roma Sheppard on their merits.

The record is clear that during the course of this marriage of nearly twenty years, each of the parties worked, labored and contributed to the accumulation of the property at issue here. As found by the trial court and supported by the record, "while the defendant's name appears as sole owner on some records in connection with many of these items, this court finds that the reason and motive behind the listing of the single name of the defendant was to take advantage of the defendant's tribal membership, and not transmute community assets or obligations into separate in character." The trial court also found that "Among those benefits were: an ease in borrowing money from Indian-based savings and loan agencies, and the availability of advantageous interest rates on savings accounts...." It is also clear that George Sheppard was a signator to and equally liable on all of those obligations, and, as found by the trial court, that the obligations were community in character.

## A.

Roma Sheppard asserts that the lower courts erred in refusing to apply 25 U.S.C. § 181 which, it is contended, bars George Sheppard from any claim or interest in the cattle operation or in any other assets located within the exterior boundaries of the Fort Hall Reservation. 25 U.S.C. § 181 provides:

"No white man, not otherwise a member of any tribe of Indians, who may on or after August 9, 1888, marry an Indian woman, member of any Indian tribe in the United States, or any of its Territories except the Five Civilized Tribes in the Indian Territory, shall be such marriage acquire any right to any tribal property, privilege, or interest whatever to which any member of such tribe is entitled."

It is argued that George Sheppard, "a white man," by his marriage to an Indian woman, attempts to acquire through the community property laws a right which only an Indian can possess, in contravention of 25 U.S.C. § 181.

The inception of that act lay in a recommendation by Secretary of Interior Lamar to Congress in 1885. H.R.Exec.Doc. No. 1, pt. 5, vol. I, 49th Cong., 1st Sess. 28 (1885). *See* 19 Cong.Rec. 6885 (1888) (remarks of Rep. Rogers). The principal concern expressed was the "great evils arising from the presence of bad and vicious white men within the reservations." H.R.Exec.Doc. No. 1, pt. 5, vol. I, 49th Cong., 1st Sess. 28 (1885). That concern was reflected in a subsequent report by the Senate Committee on Indian Affairs chaired by Senator Dawes, the bill's author, and was echoed on the House floor during debate on the bill. S.Rep. No. 1278, 49th Cong., 1st Sess., pt. 1, 21 (1886); 19 Cong.Rec. 6885 (1888). It was believed that these "bad and vicious white men" had motives in marrying Indian women, *i.e.,* to obtain Indian headrights, and to put themselves beyond the power of the state courts by becoming tribal members. The act sought to eliminate both incentives for marrying Indian women. Representative Rogers stated:

"The object and purport of this bill, therefore, is that if these parties intermarry, if a man wants to abandon civilization and going into that country and marrying a squaw to get a head-right, he shall not get it." 19 Cong.Rec. 6885–6886 (1888).

Representative Peters stated:

"One of the motives that induce a man to marry an Indian woman is that he may obtain certain rights under the tribe into which he marries, a head-right, for instance. . . . Another motive—and this is the one which actuates the baser sort to intermarry with Indians—another motive is that he may become part of the tribe, subject to tribal law and may thereby put himself outside of the civilized law, which he leaves when he marries into the tribe." *Id.* at 6886.

Even assuming that nearly one hundred years later, the sole motivation for a non-Indian to marry an Indian woman is an avarice for a headright, or to escape the operation of the "civilized law," and assuming the constitutionality of such statute, which we deem questionable in light of gender-based equal rights protections, nevertheless we hold 25 U.S.C. § 181 to be inapplicable to the case at bar.

A headright is defined as an interest in trust funds arising from mineral income from land held or once held by the tribe, as well as the right to any royalties or interest. *In re Estate of Tayrien,* 609 P.2d 752 (Okla.1980); *Globe Indemnity Co. v. Bruce,* 81 F.2d 143 (10th Cir.1935). *See* F. Cohen, *Handbook of Indian Law* 791 n. 192 (1982 ed.). Here it is clear that George Sheppard neither sought nor obtained a headright or membership in the Shoshone-Bannock tribe. It also is suggested that this section was intended to prevent whites from acquiring allotments under the Dawes Act. Cohen, *supra,* at 132–33. However, it is likewise clear that George Sheppard in this action seeks no right to an allotment. The statute on its face forbids a "white man" by virtue of his marriage to an Indian woman from acquiring any right in "*tribal* property, privilege or interest" (emphasis

added). Trust property is not tribal property; it is the property of an individual Indian. *See* Cohen, *supra*, at 628–29. We find no assertion that the cattle operation was "tribal property," either because of its location or because borrowed funds in part financed its purchase. Hence, we find 25 U.S.C. § 181 inapplicable to the case before us.

### B.

Roma Sheppard next asserts that the trial court erred in failing to apply 25 U.S.C. § 194, which provides:

"In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership."

■ Assuming that 25 U.S.C. § 194 is applicable in the instant case, *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), we hold that George Sheppard has carried the burden of proof. As above noted, the issue was extensively tried; the trial court made findings and conclusions that the property was community, notwithstanding that some of it was held in the individual name of Roma Sheppard, and such findings are more than amply supported by the evidence. Although George Sheppard asserts the unconstitutionality of 25 U.S.C. § 194, in view of our holding we need not address that contention. *C f. United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977); *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

### C.

We now turn to the more vexing questions raised by appellant and amicus curiae regarding the alleged lack of jurisdiction of the state courts to determine that the properties in question here were the community property of the parties and to divide those properties in kind or, as here, to award substantially all of the properties to one of the parties and make an offsetting award of money to the other party. Initially we note the absence of any assertion that the trial court lacked jurisdiction over the parties. Rather appellant and amicus curiae assert in essence that state courts in the instant circumstances lack jurisdiction to consider properties either real or personal located within the exterior boundaries of an Indian reservation, and secondly, that even assuming a once existing jurisdiction, such has been pre-empted by federal law.

We are cited to no authority, either state or federal, arising from circumstances precisely as exist in the instant case, *i.e.,* conflicting claims to property arising from a divorce in which one of the parties is an Indian and the other a non-Indian, despite the literally thousands of reported decisions in Indian law. We find that the welter of confusing and conflicting policies and decisions in what might otherwise be considered analogous cases is of little or no assistance to our analysis and disposition.

We are cited to no authority indicating that state courts may not exercise jurisdiction over divorce proceedings when one of the parties is an Indian, or indeed when both parties are Indian. As noted above, no such argument is made on this appeal. Respondent argues that in the event such jurisdiction was lacking, it has been authorized, at least as far as Idaho is concerned, by express congressional enactment. 25 U.S.C. § 1322.

We believe that any attempt to understand the interrelationship of state law and federal law vis-a-vis the Indian as an individual or as a tribe, must begin with a review of the schizoid policies of the federal government toward the Indian. *See generally* F. Cohen, Handbook of Federal Indian Law 47–206 (1982 ed.); R. Berkhofer, The White Man's Indian (1978); S. Tyler, A History of Indian Policy (1973).

In the early nineteenth century, the federal government policy was to move the Indian out of the eastern seaboard states

and toward the west into what was then denominated "Indian country." As the tier of states along the Mississippi River were admitted to the Union, they, too, desired that the Indian be moved further westward, and the federal policy ultimately complied with their desires.

As the westward expansion of the country neared completion and it became apparent that there was no open country left to which the Indian could be further moved, the establishment of the Indian on a reservation became a fact. The federal policy then shifted to one of assimilation of the Indian into the mainstream of American culture. That policy was epitomized by the Dawes Allotment Act of Feb. 8, 1887, ch. 119, 24 Stat. 388, codified as amended at 25 U.S.C. §§ 331–358. It was designed to accelerate assimilation by giving individual Indians plots of reservation land upon which each could build a base of agricultural independence. Theoretically it would give individual Indians self-sufficiency so that they would not have to rely on their tribe and its customs, and thereby the tribes would be caused to wither away.

In the 1930's under the Wheeler-Howard Act, codified as amended at 25 U.S.C. §§ 461–479, also known as the Indian Reorganization Act, allotment was ended, and Indians were encouraged to retain and develop tribal identities. Less than 20 years later, the policy was changed and again the termination of tribes as separate entities was actively encouraged, as was the assimilation of individual Indians. Public Law 280, discussed herein, was passed in the 1950's as an integral part of those termination efforts. Then during the 1960's, federal policy was again changed, shifting back from termination and again to reenforcement of tribal government. See Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–1341. One provision of that Act restricted the states from assuming Public Law 280 jurisdiction over a tribe unless the affected tribe had consented to state jurisdiction. 25 U.S.C. § 1322(a). That Act, however, did not purport to terminate the jurisdiction that states had obtained prior to 1968 under the provisions of Public Law 280.

This more deferential approach to tribal sovereignty continues today, but within somewhat narrower boundaries. As examples, the Court has held that tribes do not have the inherent sovereign power to regulate non-Indian fishing and hunting on land within reservation boundaries but held in fee by non-members of the tribe. *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). In *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), it was held that tribal courts lack jurisdiction to try a non-Indian for a criminal offense committed on the reservation. However, in *Montana v. United States, supra,* 450 U.S. at 565, 101 S.Ct. at 1258, it was stated that tribes retain sovereignty to regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members." *See generally,* American Indian Policy Review Comm'n, 95th Cong., 1st Sess., *Final Report* (1977).

Both appellant and respondent argue that the terms of Public Law 280 are among the principal elements governing the instant controversy. That statute specifically permits states to assume jurisdiction over Indian tribes. The relevant language of Public Law 280 is as follows:

"The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

Act of Aug. 15, 1953, ch. 505 § 7, 67 Stat. 590, as amended 25 U.S.C. §§ 1321–26 (1970) (requiring Indian consent for future assertions of jurisdiction).

Pursuant to this authority the Idaho legislature enacted I.C. §§ 67–5101 through 67–5103. Section 67–5101 provides, in pertinent part:

"The state of Idaho, in accordance with the provisions of 67 Statutes at Large,

page 589 (Public Law 280) hereby assumes and accepts jurisdiction for the civil and criminal enforcement of state laws and regulations concerning the following matters and purposes arising in Indian country located within this state, as Indian country is defined by title 18, United States Code 1151, and obligates and binds this state to the assumption thereof:

\* \* \* \* \* \*

F. Domestic relations."

The sparse legislative history of Public Law 280 offers no assistance in determining its applicability to the facts of this case. *See* S.Rep. No. 699, 83d Cong., 1st Sess. (1953); H.R.Rep. No. 848, 83d Cong., 1st Sess. (1953); 99 Cong.Rec. 10782–84 (1953). One commentator has gleaned from unpublished transcripts of the Congressional hearings that the provision extending civil jurisdiction to the states was added as an afterthought in furtherance of the legislation's primary aim of curbing lawlessness on the reservations. Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians,* 22 U.C.L.A.L.Rev. 535, 543–44 (1975). The Supreme Court has determined that Congress' focus leading to enactment of Public Law 280 was centrally to curb lawlessness on the reservations and secondarily to cure the lack of adequate Indian forums for resolving private disputes. *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

▮ In *Bryan,* the Court undertook the most comprehensive examination of Public Law 280 to date, and, while it is not directly on point, we look to it for whatever guidance it may offer. Itasca County attempted to levy a personal property tax on a mobile home owned by an enrolled member of the Minnesota Chippewa Tribe which was located on trust land within the boundaries of the Leech Lake Reservation. The Court held that there was no inherent authority to tax the property so located, and that Public Law 280 did not grant the states such a right. Examining and quoting unpublished transcripts of the hearings on the House bill, it was revealed that the

purpose behind the civil jurisdiction section was to provide Indians access to state courts, "to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes." 426 U.S. at 383, 96 S.Ct. at 2108. The Court also stated that Congressional authorization of state jurisdiction over:

" 'civil laws . . . of general application to private persons or private property' would include the laws of contract, tort, marriage, *divorce,* insanity, descent, etc., but would not include laws declaring or implementing the states' sovereign powers, such as the power to tax, grant franchises, etc. These are not within the fair meaning of 'private' laws." 426 U.S. at 384 n. 10, 96 S.Ct. at 2108 n. 10 (emphasis added).

Hence, we conclude that *Bryan* draws a clear distinction between state regulatory and taxing activity, which is not authorized by Public Law 280, and state jurisdiction over private civil actions for divorce, which is authorized by that law. Thus, if a state chooses to accept jurisdiction over divorce and community property actions, such jurisdiction is authorized under Public Law 280.

▮ Turning to I.C. § 67–5101, we hold that subsection (F) authorizing state jurisdiction in "Domestic Relations" cases is sufficient to supply jurisdiction over this divorce action and accompanying division of community property. Divorce and division of community property both clearly are part of Idaho's domestic relations law as evidenced by the construction of the Code. Title 32 expressly covers "Domestic Relations." Chapters 6, 7 and 8 of that title cover divorce. I.C. §§ 32–601 through –616, 32–701 through –718, and 32–801 through –805. Chapter 9 of the same title covers the law of community and separate property. I.C. §§ 32–901 through –920. Hence, we believe that when the legislature passed I.C. § 67–5101 it intended to grant state courts the power to adjudicate divorce cases and the accompanying division of

community property when one or both of the parties are reservation Indians.

This conclusion is reinforced by the realization that the whole subject of domestic relations belongs to the laws of the states and not to the laws of the United States. *In re Burrus,* 136 U.S. 586, 593–594, 10 S.Ct. 850, 852–853, 34 L.Ed. 1500 (1890); *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979). Also buttressing our conclusion is the fact that Indians are not only citizens of the United States, but also citizens of the state in which they reside, regardless of whether they are enrolled members of a tribe or whether they live on or off reservation lands. 8 U.S.C. § 1401(b). *See Boyer v. Shoshone-Bannock Indian Tribe,* 92 Idaho 257, 441 P.2d 167 (1968); *State v. Rorvick,* 76 Idaho 58, 277 P.2d 566 (1954).

We are aware that assumption of jurisdiction by Idaho, Arizona and Washington, prior to the 1968 amendments to Public Law 280, over only certain enumerated subject matters has been criticized as invalid because these acceptances allegedly do not comply with the intent of the Act. Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians,* 22 U.C.L.A.L.Rev. 535, 557 (1974). However, this objection has been laid to rest by *Washington v. Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), where the Court upheld Washington's assumption of partial subject matter jurisdiction as a reasonable attempt to accommodate both state and tribal interests. The Washington and Idaho statutes providing for partial subject matter jurisdiction are virtually identical in the subjects covered. *Compare* I.C. § 67–5101 *with* Wash.Rev. Code § 37.12.010. Hence, we believe that our legislature's assumption of jurisdiction comports with the intent of Public Law 280, as outlined in *Yakima.*

D.

Appellant argues, however, that the language of 25 U.S.C. § 1322(b) and I.C. § 67–5103 precludes the state courts from dealing with much of the property that the

parties have accumulated. 25 U.S.C. § 1322(b) provides:

"Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute, or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."

Similarly I.C. § 67–5103 provides, in language that tracks the federal statutes:

"Nothing in this act shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the state to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under federal treaty, agreement, statute, or executive order with respect to Indian land grants, hunting, trapping or fishing or the control, licensing, or regulation thereof."

The property at issue here can be divided into three broad categories: the cattle operation, the household goods, including the house, and the two parcels of grazing land. Appellant argues that the cattle operation should be excluded from

the courts' jurisdiction because it was financed in large part from an Indian lending agency and was located on the reservation. However, by their express terms, the federal statute and its state counterpart only exclude trust property and property subject to restraints on alienation imposed by the federal government. Nothing in the record shows this cattle operation to be either trust property or subject to restraints on alienation and we do not apprehend appellant as arguing that it is. Hence, these statutes do not prevent state courts from considering and dividing this property, even though it is within the boundaries of the reservation. The household goods also may be included, for there is no showing in the record that there was even an Indian loan behind their acquisition. The house is located on trust land held by appellant's father. However, in the proceedings below, both parties treated it as severable from the land upon which it sits, and in their pleadings both parties alleged it to be community property. Appellant apparently does not now argue that the house belongs to her father, on whose land it sits. Having taken such a stand, appellant may not now argue that the house is trust property, particularly since, in the same answer in which she alleged the house to be community property, she alleged the existence of the trust on the grazing lands. *Cf., Heckman Ranches, Inc., v. State,* 99 Idaho 793, 589 P.2d 540 (1979). While the final category of property, the parcels of grazing land, are held either in trust for appellant or subject to a restriction on alienation imposed by the federal government, it is unclear which is the case, and it does not matter since the statutes apply equally to both types of property. It is to this grazing land that we now turn. For purposes of identification only, we shall refer to this property herein as trust property, without so deciding.

In this case the magistrate and the district court did not divide the grazing parcels in kind, and the value placed on the property was severely limited because of these restraints on alienation. Rather the property was valued at the amount of community funds that was used to purchase it. The

court then ordered, in effect, that respondent be recompensed for his portion of the community funds used to purchase that property. The property remains in the name of appellant and the court has done nothing which affects title to the property.

In analyzing this particular situation under 25 U.S.C. § 1322(b) and I.C. § 67–5103, again we find no congressional history of any assistance and no case law on point. The otherwise analogous case law likewise is of little assistance because most of it involves states which do not have Public Law 280 jurisdiction.

Turning then to more general principles governing Indian law, we find that statutes passed for the benefit of Indians are to be construed in the Indians' favor. *E.g., Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976). Secondly, in contrast to the usual method of statutory interpretation and perhaps as a method of dealing with the shifting sands of federal Indian policy, the Court has stated that legislation concerning Indians, including Public Law 280, should be construed "in light of 'intervening' legislative enactments." *Bryan v. Itasca County, supra,* 426 U.S. at 386, 96 S.Ct. at 2109. Similarly, the Ninth Circuit has stated that it would not "strain to implement a policy Congress has now rejected" (*i.e.,* assimilation), particularly where Congress has an ongoing relationship with the tribe. *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 663 (9th Cir.1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). Therein, as well as in *Bryan,* it was stated that Public Law 280 was not an attempt to fully implement termination, arguing that if such had been the intent of Congress, it could have done so specifically as in other acts whereby individual tribes were fully terminated. *See e.g.,* 25 U.S.C. §§ 691–708 (termination of federal supervision over western Oregon Indians). *See also* F. Cohen, Handbook of Federal Indian Law 173–74 (1982 ed.) (listing termination acts). More recently, many of these "terminated"

tribes have had federal supervision restored. *See e.g.,* 25 U.S.C. § 711 et seq. (restoration of federal supervision over Siletz Tribe of western Oregon, passed in 1977).

Although there appears some authority to the contrary, we ascertain the rule to be that despite the general assimilationist intent of Congress during the 1950's, the exceptions to state jurisdiction contained in Public Law 280 must be broadly construed to preclude state courts from acting to directly affect trust property. *Bryan v. Itasca County, supra; U.S. v. County of Humboldt,* 615 F.2d 1260 (9th Cir.1980); *Santa Rosa Band of Indians v. Kings County, supra; Snohomish County v. Seattle Disposal Co.,* 70 Wash.2d 668, 425 P.2d 22, *cert. denied,* 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662 (1967). *See Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). *See also* Comment, *State Jurisdiction Over Indian Land Use: An Interpretation of the "Encumbrance" Savings Clause of Public Law 280,* 9 Land & Water L.Rev. 421 (1974). *But see Agua Caliente Band of Mission Indians' Tribal Council v. City of Palm Springs,* 347 F.Supp. 42 (C.D.Cal.1972) (vacated by 9th Cir. in an unpublished opinion, 1975); *Rincon Band of Mission Indians v. County of San Diego,* 324 F.Supp. 371 (S.D.Cal.1971), *aff'd on other grounds,* 495 F.2d 1 (9th Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). Such a conclusion does not end our inquiry, however. The fact that an Indian is involved in a controversy, particularly a controversy involving a non-Indian, does not automatically strip the state of all power to deal with the controversy under state law, and a state court has such power unless the subject matter is within exclusive federal authority. *Cf. White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); *Odenwalt v. Zaring,* 102 Idaho 1, 624 P.2d 383 (1980).

As was stated in *White Mountain Apache Tribe v. Bracker, supra:*

"Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3 [citation omitted]. This congressional authority and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law [citations omitted]. Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them' [citations omitted]. The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members....

\*   \*   \*   \*   \*   \*

The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law. Tribal reservations are not States, and *the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other.* The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law [citations omitted.]" 448 U.S. at 142–143, 100 S.Ct. at 2582–2583 (emphasis supplied).

*Accord Ramah Navajo School Bd. v. Bureau of Revenue of New Mexico,* —— U.S. ——, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).

There are important distinctions, of course, between *Bracker* and the instant situation. In *Bracker,* the "regulatory authority" referred to was taxation, and although a non-Indian was involved, the relationship was between that non-Indian and the tribe, and the non-Indian was asserting the sovereignty of the tribe as a bar to state taxation of activities resulting from his business relationship with the tribe. As noted earlier, the Court in *Bryan v. Itasca County, supra,* drew a clear distinction be-

tween state regulation, including taxation, under Public Law 280 and civil controversies such as are involved here.

We have examined the relevant treaties between the United States and the Shoshone-Bannock Tribes and found nothing which reserves to the tribe civil jurisdiction over non-Indians or the right to regulate contracts between individual tribal members and individual non-Indians. Indeed, those treaties generally refer to property disputes between non-Indians and the United States. Treaty With the Shoshone-Northwestern Bands, 1863 (Box Elder) 2 Kappler 850; Treaty With Mixed Bands of Bannacks and Shoshonees, October 14, 1863 (Soda Springs) 5 Kappler 693 (unratified); Treaty with the Eastern Bank Shoshoni and Bannock, 1868 (Fort Bridger) 2 Kappler 1020. *See also Shoshone Tribe v. United States,* 11 Ind.Cl.Comm'n 387 (1962), for a discussion of those treaties.

From the Supreme Court decisions, the jurisdictional distinction between those states with Public Law 280 jurisdiction and those states without it is somewhat blurry. In *Washington v. Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); and *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), there is language indicating that the states have power over Indian affairs whenever Congress has provided for such authority, presumably implying Public Law 280. However, in *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), there is language indicating that even if Congress has granted states the authority to act under Public Law 280, they nevertheless could be disabled from so acting:

"And nothing in its legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than 'private, voluntary organizations.'" *Id.,* 426 U.S. at 388, 96 S.Ct. at 2110.

One court with Public Law 280 jurisdiction has suggested that it, too, must determine whether state exercise of jurisdiction infringes the Indian right to self-government, as set forth in *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). *Duluth Lumber and Plywood Co. v. Delta Development, Inc.,* 281 N.W.2d 377 (Minn. 1979). *See* Note, *State Jurisdiction Over Indians as a Subject of Federal Common Law: The Infringement-Preemption Test,* 21 Ariz.L.Rev. 85 (1979). However, this infringement test cannot have the same scope in states, like Idaho, with Public Law 280 jurisdiction as it does in states without it; otherwise the legislation was a meaningless act, something we will not presume Congress intended. *Cf. Duluth Lumber, supra* (distinguishing cases arising in non-Public Law 280 jurisdictions). Until the Supreme Court clarifies the confusion it has created, we and all other courts are left to grope our way in the darkness. Hence we must examine the law of both Public Law 280 jurisdictions and that of non-Public Law 280 jurisdictions for whatever guidance we can discern.

*Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), is the seminal case in establishing the standard by which non-Public Law 280 states may assert jurisdiction over Indians on reservation land. There the Court held that a state could not exercise jurisdiction in a way that would infringe upon tribal self-government, and set forth the generalized test known as the infringement test. In *Williams,* a non-Indian was a federally licensed trader residing on the Navaho reservation who sought to collect a debt against an Indian in the state courts of Arizona. The Supreme Court reversed the Arizona court judgment in favor of the trader, holding that no jurisdiction existed therefor. That holding appears based on two grounds: one, that Arizona had not accepted and assumed Public Law 280 jurisdiction; and two, that to allow "the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence

would infringe on the right of the Indians to govern themselves." *Id.,* 358 U.S. at 223, 79 S.Ct. at 272. Most of the succeeding litigation has been attempts to apply that test rather than focusing on the exceptions to Public Law 280 jurisdiction. *See Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (holding that both the state and the tribe can tax cigarette sales to non-Indians); *White Mountain Apache Tribe v. Bracker, supra* (holding non-Indian logging operations conducted under contract with the tribe and solely on the reservation cannot be taxed by the state); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (holding that state cannot impose vendor taxes on Indian sellers who operate on the reservation); *Bryan v. Itasca County, supra* (holding a state with Public Law 280 jurisdiction may not tax personal property located on trust lands); *McClanahan v. Arizona State Tax Comm'n, supra* (holding a state cannot impose an income tax on Indians whose income is solely from reservation sources); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) (holding the state can tax gross receipts of tribal enterprise operated off the reservation); *Warren Trading Post v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (holding state may not impose tax on non-Indian trader operating on the reservation). As to state assertions of jurisdiction in criminal cases, *see United States v. John,* 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978); *Oliphant v. Suquamish Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975).

We turn next to state court cases and federal circuit court cases. Initially it is necessary to distinguish between those states with Public Law 280 jurisdiction and those without such jurisdiction.

Two courts have held that states with Public Law 280 jurisdiction cannot enforce their land-use regulations on trust land located on the reservation. *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir.1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977); *United States v. County of Humboldt,* 615 F.2d 1260 (9th Cir.1980); *Snohomish County v. Seattle Disposal Co.,* 425 P.2d 22 (Wash.), *cert. denied,* 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662 (1967). *But see People v. Rhoades,* 12 Cal.App.3d 720, 90 Cal.Rptr. 794 (1970), *cert. denied,* 404 U.S. 823, 92 S.Ct. 46, 30 L.Ed.2d 51 (1971) (holding that a state can require firebreaks around housing on trust property adjacent to forest lands).

Alaska, which has Public Law 280 jurisdiction, has held that that Act does not grant state courts the power to determine whether claimants to a share of decedent's stock in a Native American Corporation are adopted children. *Calista Corp. v. Mann,* 564 P.2d 53, 57–58 (Alaska 1977). The Alaska court also, in *Ollestead v. Native Village of Tyonek,* 560 P.2d 31 (Alaska), *cert. denied,* 434 U.S. 938, 98 S.Ct. 426, 54 L.Ed.2d 297 (1977), held state courts were without jurisdiction to determine whether claimants to oil royalties were members of a Native Village.

In *Comenout v. Burdman,* 84 Wash.2d 192, 525 P.2d 217 (1974), the court held that jurisdiction under Public Law 280 existed to terminate the parental rights of reservation Indians. *See also In re Adoption of Buehl,* 87 Wash.2d 649, 555 P.2d 1334 (1976); *Duluth Lumber and Plywood Co. v. Delta Development, Inc.,* 281 N.W.2d 377 (Minn. 1979) (holding the existence of jurisdiction in state courts to hear a dispute by a materials supplier against a contractor in an Indian housing agency under the authority of Public Law 280). *Voorhees v. Spencer,* 89 Nev. 1, 504 P.2d 1321 (1973) held the existence of state court jurisdiction to administer the off-reservation bank account of a decedent Indian, notwithstanding that his reservation trust property was administered by the Department of Interior and his on-reservation personal property was administered by the tribal court. *See also O'Connell v. Hamm,* 267 N.W.2d 839 (S.D.

1978) (involving the refusal to impose a constructive trust on reservation land purchased by Indian daughters of a non-Indian father in a non-Public Law 280 jurisdiction). In *Powell v. Farris,* 94 Wash.2d 782, 620 P.2d 525 (1980), the state courts did not have Public Law 280 jurisdiction over the Puyallup Reservation. Nevertheless, it was held that jurisdiction existed to terminate a partnership and render an accounting for an on-reservation business, when one of the partners was a member of the Puyallup tribe and the other was a non-Puyallup Indian, because there was no infringement on tribal sovereignty.

In *Chino v. Chino,* 90 N.M. 203, 561 P.2d 476 (1977), a husband and wife were both Indians but of different tribes. They resided on the reservation of the husband and when they divorced, parallel proceedings were brought in state and tribal courts. The trial court awarded the wife a house on the reservation, but the husband's son moved into the house. The former wife then filed a forcible entry and wrongful detainer suit in state court, and on appeal, it was held that under the *Williams* infringement test, the state court lacked jurisdiction to hear the case even though the tribal court recognized no right of action for forcible entry and wrongful detainer. *See also Conroy v. Conroy,* 575 F.2d 175 (8th Cir.1978) (holding that tribal courts have jurisdiction to divide trust property in a divorce action when both parties are Indians).

In tort cases in non-Public Law 280 jurisdictions, the general rule appears to be that an Indian defendant cannot be sued in state court for a cause of action arising on the reservation even if there be no tribal forum available. *Schantz v. White Lightning,* 502 F.2d 67 (8th Cir.1974); *Poitra v. Demarrias,* 502 F.2d 23 (8th Cir.1974); *Valdez v. Johnson,* 68 N.M. 476, 362 P.2d 1004 (1961); *Nelson v. Dubois,* 232 N.W.2d 54 (N.D. 1975); *Gourneau v. Smith,* 207 N.W.2d 256 (N.D.1973); *Sigana v. Bailey,* 282 Minn. 367, 164 N.W.2d 886 (1969). However, it has been held that jurisdiction exists in a state court as to a suit brought by an Indian plaintiff against a non-Indian defendant for an on-reservation tort. *Paiz v. Hughes,* 76 N.M. 562, 417 P.2d 51 (1966).

It has been held in Montana that state jurisdiction to hear a divorce proceeding between two Indians is dependent upon whether the tribes to which the parties belong have adopted a tribal code. *See State ex rel. Stewart v. District Court,* 609 P.2d 290 (Mont.1980); *State ex rel. Iron Bear v. District Court,* 162 Mont. 335, 512 P.2d 1292 (1973); *see also Chino v. Chino, supra. Cf. Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (holding no state court jurisdiction in an adoption proceeding). In New Mexico it has been held that an Indian can be brought before a state court to answer a URESA petition for support of his child. *Natewa v. Natewa,* 84 N.M. 69, 499 P.2d 691 (1972).

We conclude that a review of the authorities, opinions of the Supreme Court, lower federal courts and our sister jurisdictions is of no assistance and presents no circumstances from which we can analogize. Likewise, we find no guidance from Congressional legislation, nor from treaties. Hence, we are left to our own devices in attempting to discern and enunciate an appropriate policy. On the one hand, we are told that state courts are the correct forums for the resolution of domestic and family disputes in the nature of divorce. *See McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981); *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). On the other hand we are told that treaties and Congressional enactments prevent states from intrusion into areas which would result in curtailment of tribal sovereignty, self-government, or development. *See White Mountain Apache Tribe v. Bracker, supra; Williams v. Lee, supra.*

Such pronouncements lend little or no assistance in the instant case. While the matter is one of family law, some of the property has vestigially Indian characteristics. Of most significance, however, is the fact that only one of the parties is Indian. It is clear that the non-Indian party has no

desire to submit himself to the jurisdiction of the tribal court for the resolution of this dispute. We are cited to no authority indicating that under the present circumstances a non-Indian must submit himself to the jurisdiction of an Indian court merely and solely because he married an Indian. Likewise it serves no purpose to analogize to cases in which governmental entities are forbidden to intrude into Indian affairs *in futuro* by way of taxation, land control, etc. Here the problem is in place. It came to exist because of the good faith and, at one time, love, of the parties for and toward each other, and their mutual efforts to bear and rear children and accumulate some of the world's goods. There is no indication in the record that prior to the divorce proceedings either sought to take advantage of the other because of status. It is only froward circumstances that the parties to this marriage are Indian and non-Indian. In the instant case the Indian party asserting the right to substantially all the property is a woman. In *Fisher v. Fisher,* presently pending before this Court, the Indian party asserting control to essentially all the property is a man.

We deem there to be nothing in the law at present to indicate that such marriages are to be discouraged (other than Congressional enactments whose time has come and gone) and indeed we perceive that such marriages are common and sanctioned by our society in general. These are hardly the unions resulting from motivations attacked by Congressional legislation of past centuries. The Indian people of today in part at least appear to be in transition from a reservation life isolated from outside influences, pressures and contacts. Today almost one-half of the Indian people reside in urban centers. We cannot expect that exposure to other people and society will fail to yield relationships and marriages between Indian and non-Indian. Today it is evident that many Indians, regardless of their reservation or tribal status, are not isolated from other society nor are they the stereotype of the poverty-stricken, opportunity-deprived, dole-ridden Indian. Rather, as in the instant case, they are educable,

employable, industrious, successful and independent.

From the foregoing we conclude that the exceptions to state jurisdiction in 25 U.S.C. § 1322(b) and I.C. § 67–5103 do not prevent the courts of this state from requiring that one party to a marriage recompense the other party for his or her share of the community contributions that have gone into property that is held in trust or subject to a restraint on alienation by the federal government. Appellant remains the sole owner of the property. No ownership of the property, equitable or legal, is being adjudicated. We believe this is particularly true under the laws of this state which provide the courts with the power to make just and equitable distributions of community property in light of all surrounding circumstances. I.C. § 32–712; *Rice v. Rice,* 103 Idaho 85, 645 P.2d 319 (1982); *Guy v. Guy,* 98 Idaho 205, 560 P.2d 876 (1977). Nor did the courts below grant respondent a right of possession in the trust property. In so acting, the courts of this state are not infringing upon the authority of the Secretary of the Interior, who has the power to settle disputes in probate over trust and allotted property. 25 U.S.C. §§ 371–380; *Akers v. Morton,* 499 F.2d 44 (9th Cir.1974), *cert. denied,* 423 U.S. 831, 96 S.Ct. 51, 46 L.Ed.2d 48 (1975). *Cf. Calista Corp. v. Mann,* 564 P.2d 53 (Alaska 1977); *O'Connell v. Hamm,* 267 N.W.2d 839 (S.D. 1978). We are cited to no similar authority in the Secretary in the case of divorce and disputes over community property.

As noted before, the Supreme Court has not clarified whether the *Williams* infringement test applies in states exercising Public Law 280 jurisdiction. Assuming such a conclusion is necessary, we also believe that the state assertion of jurisdiction over this cause of action does not infringe upon tribal sovereignty. The tribal code introduced in evidence in this case expressly recognizes the concept of community property. Law and Order Code of the Shoshone-Bannock Tribe of Indians, ch. VI, § 5.1 (1972). Thus, application of communi-

ty property principles alone does not offend tribal sovereignty. Secondly, while a state court cannot directly affect title to property in another state, *Fall v. Eastin,* 215 U.S. 1, 30 S.Ct. 3, 54 L.Ed. 65 (1909), divorce courts have the power to determine whether property in another state or even a foreign country is community or separate and to determine the parties' interest in that property. *In re Marriage of Fink,* 25 Cal.3d 877, 160 Cal.Rptr. 516, 603 P.2d 881 (1980); *Brown v. Brown,* 590 S.W.2d 808 (Tex.Civ. App.1979); *Noble v. Noble,* 26 Ariz.App. 89, 546 P.2d 358 (1976); *Rozan v. Rozan,* 49 Cal.2d 322, 317 P.2d 11 (1957). Courts in other states then must accord those decrees full faith and credit. *Braselton v. Clearfield State Bank,* 606 F.2d 285 (10th Cir. 1979); *Allis v. Allis,* 378 F.2d 721 (5th Cir.), *cert. denied,* 389 U.S. 953, 88 S.Ct. 337, 19 L.Ed.2d 363 (1967); *Rozan v. Rozan, supra.* If state courts can so deal with property located in another state, surely they must be able to make the lesser intrusion of calling for a reimbursement of one party's share of community expenditures in trust property without offending tribal sovereignty, particularly since tribal sovereignty does not rise to the same level as that of a state. *Cf. White Mountain Apache Tribe v. Bracker, supra.* Nor does this civil action infringe on the right of Indians residing on the reservation to make their own laws and be ruled by them. *Cf. Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 156, 100 S.Ct. 2069, 2082, 65 L.Ed.2d 10 (1980).

■ It also is argued that federal law preempts state courts from dealing with the property at issue, because of federal regulations of Indian lending agencies and trust property. Initially we find it difficult to perceive how federal law could preempt state action in this field, when federal law expressly grants the states the power to act, in Public Law 280. However, federal preemption is described as one of the two means of ousting state jurisdiction over Indian affairs. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Until the Supreme Court clarifies whether this disability applies in Public Law 280 jurisdictions, we must deal with the contention.

This case, of course, deals with state domestic relations laws. In the area of family property law, the state law must do "major damage" to clear and substantial federal interests before the Supremacy Clause will require that state law be overriden. *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981); *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979).

*McCarty* and *Hisquierdo* held, however, that federal law did preempt some state community property law and forbade the states from dividing military or railroad retirement benefits or from granting the spouse an award to offset the denial of a share of those benefits, from among the other community property. Among the reasons for refusing to permit state courts to make an offsetting award were the uncertainties of receiving the full benefits because of early death or unilateral Congressional action, Congress' decision to cut off benefits to spouses upon divorce, and the harm such an award would do to the inducement to retire which those benefits were intended to create.

First we note that the courts below did not make an offsetting award of the value of the property; instead appellant was ordered to reimburse respondent for his share of the community property used to buy the trust property. Second, none of the problems presented in *McCarty* and *Hisquierdo* are present in the facts before us. Here the property already is in the hands of appellant. It is not an expectancy which can be diminished or taken away by her early death or Congressional action. There is nothing in the federal regulations over trust land that states what a divorced spouse's interest is in the property, further buttressing our conclusion that this area is left to more traditional means of adjudication. Finally, because the Shoshone-Bannock Tribe recognizes community property law, the application of the state's community property law offers no disincentive for a

tribal member to acquire trust property. For these reasons, we believe that both *McCarty* and *Hisquierdo* are inapposite in the instant case. In addition this case does not involve state taxation or regulation of Indian land which is consistently held to be preempted. *Ramah Navajo School Board v. Bureau of Revenue of New Mexico,* — U.S. —, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

Assuming, arguendo, that the preemption doctrine is applicable here, we believe that the facts of this case fall within the exception to the preemption doctrine announced in *Yiatchos v. Yiatchos,* 376 U.S. 306, 84 S.Ct. 742, 11 L.Ed.2d 724 (1964). There, Angel Yiatchos used community funds to purchase federal savings bonds, the survivorship provisions of which controlled over contrary state law. *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). On those bonds his brother was named as beneficiary. In the ensuing litigation after Angel's death, his wife asserted her community property interest in the bonds, despite the federal survivorship provisions. The Court held that if purchasing these bonds acted as a fraud on the wife's property rights under state law or as a breach of trust, then the federal survivorship provisions would not preempt state law. The Court also stated:

> "It would seem obvious that the bonds may not be used as a device to deprive the widow of property rights which she enjoys under Washington law and which would not be transferable by her husband but for the survivorship provisions of the federal bonds." 376 U.S. at 309, 84 S.Ct. at 744.

Additionally, the Court recognized that either an offsetting award of the value of the bonds could be made or that they might be divided in kind by the Washington courts.

Here all the property, including the trust property, was acquired with community funds, as in *Yiatchos,* and unlike in *McCar-*

ty and *Hisquierdo,* in which the benefits were created by Congress. Under Idaho law the spouse with control over the community property acts as trustee for the community. *See Linton v. Linton,* 78 Idaho 355, 303 P.2d 905 (1956); *Morgan v. Firestone Tire & Rubber Co.,* 68 Idaho 506, 201 P.2d 976 (1948). The courts below found that the cattle operation was community property; that the trust property was acquired with proceeds of the cattle operation; and that many of the assets were kept in the name of appellant, only because the community could take advantage of the benefits of her tribal membership, rather than for the purpose of transforming those assets into her separate property. For respondent, who ran much of the operation, to keep the assets in her name alone so the community could take advantage of her tribal membership, then when the marriage begins to break apart, to seek to shield those assets behind a federal statute claiming preemption, would be a breach of her fiduciary duty as trustee. As such, *Yiatchos* forbids her from depriving her husband of his property rights under Idaho law by means of the preemption doctrine.

Our conclusion that state courts have the power to award a spouse recompense for his or her portion of the community contribution used to purchase trust property is further buttressed by the decision of *West v. Oklahoma Tax Comm'n,* 334 U.S. 717, 68 S.Ct. 1223, 92 L.Ed. 1676 (1948). Therein the Court held that a state could include the trust property of an Osage Indian in its calculation of the value of his estate for state estate tax purposes. *See also United States v. Mason,* 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *but see Kirkwood v. Arenas,* 243 F.2d 863 (9th Cir.1957). *West* supports the inference that not all attempts by the states to deal indirectly with trust property are forbidden. While permitting inclusion of trust property in the estate for tax purposes, the Court recognized that it might have some effect on the property and that "complications" might arise over the validity of any attempt to place or enforce a lien on trust property. *West, supra,* 334 U.S. at 725, 68 S.Ct. at 1227.

Here respondent's contribution to the trust property was valued by the court below at less than $2,500. Appellant remained in possession of non-trust property worth over $75,000. Thus, while possible, it is unlikely that "complications" might arise from our decision to permit trial courts to order the spouse in possession of trust property to compensate the other spouse for his or her contributions to the trust property. Any such "complications" are not before us and we decline to speculate what effect they might have on a different set of facts.

Returning to 25 U.S.C. § 181, discussed at part III A, *supra,* it is argued that this statute preempts state community property law. Having determined that it does not apply to the facts of this case, we hold that neither does it indirectly act to preempt state law.

Summarizing our holdings on the jurisdiction of state courts to deal with the community property in this case: This action is specifically authorized by Public Law 280; it is not prohibited by the exceptions to jurisdiction in that Act; assuming that the preemption and infringement tests apply in Public Law 280 jurisdictions, we find that the trial court's action violates neither test; and the terms of 25 U.S.C. §§ 181 and 194 do not alter the trial court's conclusion.

### IV.

■ Lastly, we turn to the question of whether Idaho community property law was properly applied to the facts of this case. It was established at trial that the cattle operation in existence at the time of the divorce (one prior cattle operation having been liquidated many years before) was funded from three principal sources. One source was $14,000 that came from stocks and bonds held by both appellant and respondent. Another was a $23,000 loan from a tribal lending agency. The remainder was $10,000 in claims settlement moneys. It is not argued by any party that the stocks and bonds were anything but community property. The $23,000 loan was made to appellant, but the tribal lending agency required respondent to sign all se-

curity agreements and to become liable thereon. This amount also is community property. It has long been established that property acquired with a loan taken by one spouse during the marriage, as this one was, is community property. *Chaney v. The Gauld Co.,* 28 Idaho 76, 152 P. 468 (1915); *Northwestern & Pacific Hypotheek Bank v. Rauch,* 7 Idaho 152, 61 P. 516 (1900). This is especially true when both spouses are liable on the note evidencing the loan. The lending agency's action in requiring respondent's security demonstrates that it chose not to rely on the separate credit of appellant. Since the loan was obtained on the credit of both parties, *i.e.,* the community, it cannot have been appellant's separate property. *Cf., Shovlain v. Shovlain,* 78 Idaho 399, 305 P.2d 737 (1956) (when wife borrowed money solely on credit of her separate property, the borrowed money remains her separate property); *Evans v. Evans,* 92 Idaho 911, 453 P.2d 560 (1969). Of the $10,000 in claims settlement moneys, $8,000 belonged to the children, only $2,000 belonged to appellant. The court awarded the children their interest in the cattle and deducted that amount from the total value, and thus that amount is not in issue. The cattle operation, therefore, was purchased with $37,000 in community assets. As to the $2,000 in arguably separate property, the court found that it could not definitively be established that it was used to purchase any of the cattle operation.

■ It is clear that property purchased with community property remains community property. *Rose v. Rose,* 82 Idaho 395, 353 P.2d 1089 (1960). When this community property is commingled with separate property and treated as community it becomes community property in its entirety. *Rose v. Rose, supra; Gapsch v. Gapsch,* 76 Idaho 44, 277 P.2d 278 (1954). In the recent case of *In re Estate of Freeburn,* 97 Idaho 845, 555 P.2d 385 (1976), this Court held that a motel purchased with mixed community and separate funds was community. Here, even if appellant's separate property was used to fund part of the cattle operation, this situation before us would be indis-

tinguishable and the cattle operation therefore is community property. However, the court found that the $2,000 in separate property was not traceable to the cattle operation. From the record before us, we cannot say that this was error. *Freeburn* also establishes that the separate estate is entitled to reimbursement from the community for such of its funds expended, unless the other party can prove a gift was intended. Here the separate estate of appellant is not entitled to reimbursement because appellant has failed to show that the $2,000 was traceable into the cattle operation.

As noted before, property purchased with community property remains community property. The trust grazing lands held in appellant's name were clearly purchased with proceeds of the cattle operation, which is properly a community asset. Hence, under federal and state Indian law and Idaho community property law, the trial court did not err in awarding respondent his share of the community funds used to purchase that trust land.

Judgment of the district court affirmed. Cause remanded to the district court with orders to remand to the magistrate court for a determination of child support for the adopted child, Michael Blackhawk Sheppard. No costs or attorney fees allowed.

McFADDEN and DONALDSON, JJ., concur.

McFADDEN, J., registered his vote prior to his retirement on August 31, 1982.

BAKES, Chief Justice, specially concurring in part and dissenting in part:

I would, as does the majority, affirm the district court on the issue of reimbursing the community, but would remand the issue of the validity of the adoption.

In Part I, the majority considers the validity of the adoption of one Michael Blackhawk Sheppard, purportedly adopted by the parties pursuant to a decree issued by the tribal court of the Shoshone-Bannock tribes, dated October 27, 1971. George Sheppard alleged in his petition for a divorce in the magistrate court that only three children

were born of the marriage. Roma Sheppard answered, alleging the existence of a fourth child, Michael, as a child of the marriage and asking for support for Michael. It was in this fashion that the question of the validity of the adoption decree issued in the tribal court was called into question. The magistrate court reviewed the provisions of the tribe's law and order code and determined that the procedures provided therein were not correctly followed. The court found that the tribal court adoption proceedings were

"fatally deficient in at least the following particular:

"(1) Plaintiff's signature on the petition was not acknowledged before a notary or a representative of the Court.

"(2) Plaintiff did not appear in Court for the adoption hearing and the judge conducted no separate examination or hearing as required by the Code."

The district court, in an appellate review, reversed the magistrate court. In doing so, the district court ruled that the tribal court had both subject matter jurisdiction and personal jurisdiction over George Sheppard, saying:

"He [George Sheppard] initially petitioned the tribal court to act. Further, respondent did not object in any manner to the adoption decree until the present action was instituted. Objections to personal jurisdiction are deemed waived if not timely asserted. In addition, it appears from the transcript, pages 58 through 61, that respondent was aware of the Decree of Adoption; that he did not object thereto; that he treated the boy as his own; that he loved the boy and considered him his son and represented to others that the boy was his son. This Court does not feel that respondent can at this time attack the proceedings."

The above statements made by the district court in its memorandum opinion on appeal were additional findings of fact not previously entered by the magistrate court.

Under Idaho law, a district court can hear appeals from the magistrate division

*either* by way of appellate review or by way of a trial *de novo.* I.R.C.P. 83(j). However, the rule requires that the district judge make a specific order that the case is to be heard as a trial *de novo* before it can be so heard. *See* I.R.C.P. 83(j)(3)(D). The district court judge in the present case did not issue such an order. In fact, the plaintiff (George Sheppard) filed a motion in the district court to augment the transcript of the magistrate court. The district court denied the motion to augment, noting that under Idaho law the district court would have to act as a trial court in dealing with any augmented matters, saying, "This Court determines that it does not wish to act as a trial court for some purposes and an appellate court for others on appeals from the Magistrate's Division and for this reason the Motion to Augment will be denied." *See Koester v. Koester,* 99 Idaho 654, 586 P.2d 1370 (1978). Thus, the district court heard this case as an appellate review, not as a trial *de novo,* and thus was not entitled to make findings upon issues of fact not considered by the magistrate court. The district court erred in making additional findings of fact on the issue of personal jurisdiction. Thus, the case should be remanded to the magistrate court to make specific findings of fact on the issue of George Sheppard's consent to the adoption. If George Sheppard did not consent, then the tribal court had no personal jurisdiction over him, and thus its decree can be collaterally attacked.[1]

On the issue of state court jurisdiction over Indian lands, I must also specially concur in affirming the district court decision. I specially concur without necessarily agreeing with or deciding the broad issues considered and decided by the majority opinion.

The magistrate court, in dividing the community property, awarded George Sheppard one-half of the amount of community funds invested in trust lands. In doing so,

the magistrate acknowledged that he was forbidden from determining ownership of the trust lands under federal law. However, in order to conclude the divorce matter, it was necessary for the magistrate to determine the extent of the community property. It was in this regard that he noted that the consideration paid for the trust lands was community property. He then ruled that "[t]he Court then as a practical matter must divide the total *purchase price consideration* in *half* and award *the one half in a matter* of dollars and cents *to the Plaintiff . . . .*"

This action of the magistrate can be characterized, not as an award to offset the value of property awarded to the other spouse, as forbidden in *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), but as reimbursement for community funds expended in the acquisition of the trust property. As the majority points out:

"From the foregoing we conclude that the exceptions to state jurisdiction in 25 U.S.C. § 1322(b) and I.C. § 67–5103 do not prevent the courts of this state from requiring that one party to a marriage recompense the other party for his or her share of the community contributions that have gone into property that is held in trust or subject to a restraint on alienation by the federal government. Appellant remains the sole owner of the property. No ownership of the property, equitable or legal, is being adjudicated." At p. 914.

I would affirm the district court's decision on the reimbursement of community issue on the basis of the above quoted portion of the majority opinion, but cannot join the balance of Part III of the majority opinion which is unnecessarily expansive and discusses issues which are not necessary to the decision in the present case in light of the facts presented.

---

1. The district court seemed to think that personal jurisdiction would nevertheless be waived in the present case, citing the rule that "[o]bjections to personal jurisdiction are deemed waived if not timely asserted." However, that rule does not apply if the person objecting to personal jurisdiction has never appeared in the action. If George Sheppard's claims that he never signed the petition for adoption are found to be true, then he never appeared in the action.

BISTLINE, Justice, concurring in part and dissenting in part.

I concur in Part I of the Court's opinion which recites the history, and in Part II which accords tribal court judgments full faith and credit. I am unable to concur in the determination of the state court jurisdiction question, finding it difficult to join an opinion which at great length reviews almost every Indian law decision rendered on that question only to

"conclude that a review of the authorities, opinions of the Supreme Court, lower federal courts and our sister jurisdictions are of no assistance and present no circumstances from which we can analogize. Likewise, we find no guidance from Congressional legislation, nor from treaties. Hence, we are left to our own devices in attempting to discern and enunciate *an appropriate policy.*" (Emphasis added.)

On the contrary, certainly some assistance is at hand, and preferable to "appropriate policy," which is clearly at odds with a host of United States Supreme Court decisions beginning with Justice Marshall's seminal opinion in *Worcester v. Georgia,* 31 (5 Pet.) U.S. 515, 8 L.Ed. 483 (1832). Finding itself clothed with jurisdiction, not because of any basis in the law, but because of its determination that "[i]t is clear that the non-Indian party has *no desire* to submit himself to the jurisdiction of the tribal court for the resolution of this dispute," the Court, putting precedent aside, determines that the non-Indian husband's desire to avoid tribal court jurisdiction will control its resolution of the issue.[1]

### I.

The starting and ending point for analysis should be the language of Public Law

1. The Court may be subconsciously indulging in the assumption that the tribal court is either incapable or unwilling to accord justice to this non-Indian. If so, it would be an inappropriate factor. Jurisdiction is not dependent upon the capabilities or integrity of a tribunal but wholly upon the lawful vesting of jurisdiction. The Indian Civil Rights Act, 25 U.S.C. § 1302 provides that:

"No Indian tribe in exercising powers of self-government shall

280, which granted designated states the right to exercise limited jurisdiction over Indian reservations which they would otherwise not be entitled to exercise. Public Law 280 in pertinent part provides that:

"(b) [No grant of state court jurisdiction] in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, ... belonging to any Indian ... that is held in trust ... or is subject to a restriction against alienation ...; or shall confer jurisdiction upon the State to *adjudicate,* in probate proceedings *or otherwise,* the *ownership or right to possession* of such property *or any interest therein.*" 25 U.S.C. § 1322(b) (emphasis added).

This law clearly and explicitly precludes states from adjudicating the ownership or right to possession of real or personal property held in trust or subject to a restriction against alienation. Pursuant to this grant of authority, the State of Idaho elected to assume jurisdiction over, *inter alia,* domestic relations matters. Idaho Code § 67–5101(F). But, this broad assumption of jurisdiction over domestic matters is expressly limited by the provisions of Public Law 280 as quoted above and by I.C. § 67–5103. In pertinent part, I.C. § 67–5103 gives recognition to the limitation in providing:

"Nothing in this act shall authorize the *alienation, encumbrance,* or taxation of any real or personal property, ... belonging to any Indian ... that is held in trust ... or is subject to a restriction against alienation ...; or shall confer jurisdiction upon the state to *adjudicate,* in probate proceedings *or otherwise,* the *ownership or right to possession* of such property or any interest therein; or shall

. . . .

"(8) *deny to any person within its jurisdiction* the equal protection of its laws or deprive any person of liberty or property without due process of law." (Emphasis added.) This provision grants those persons, non-Indian as well as Indian, the same protections as are afforded litigants in state and federal courts. Many of the foreign nations of the world with whom the citizens of this country carry on commerce have no such guarantee whatever.

deprive any Indian or any Indian tribe ... of any *right, privilege, or immunity* afforded under federal treaty, agreement, statute, or executive order *with respect to Indian land grants,* ... or the control, ... thereof." (Emphasis added.) This provision precludes state courts not only from adjudicating the ownership or right to possession of Indian trust property but also from depriving any Indian or Indian tribe of any right, privilege or immunity otherwise enjoyed with respect to Indian land grants.

## II.

A. The Court holds that Roma Sheppard is precluded from urging on appeal that the house, which was built on trust property, and which is not on Roma Sheppard's property but on her father's, and which makes up most of the value of the household goods is trust property. The Court reasons thusly:

"The house is located on trust land held by appellant's father. However, in the proceedings below, both parties treated it as severable from the land upon which it sits, and in their pleadings both parties alleged it to be community property.... Having taken such a stand, it is too late for appellant to now argue that the house is trust property ...."

Philosophically the statement is sound as applied to parties litigating the nature of property which is *not* on the reservation. Generally, it is true that a party may not be heard to raise a new issue or theory on appeal. But, does that proposition apply to concerns of subject matter jurisdiction? I think not. An elementary rule of law is that subject matter jurisdiction may not be waived at the whim of the parties and such issue will be considered even for the first time on appeal—sometimes *sua sponte.* J. Cound, J. Friendenthal and A. Miller, *Civil Procedure* 21–22 (1968); *Capron v. Van Noorden,* 6 U.S. (2 Cranch) 126, 2 L.Ed. 229

(1804), *Richardson v. Ruddy,* 15 Idaho 488, 98 P. 842 (1908); *Aram v. Edwards,* 9 Idaho 333, 74 P. 961 (1903); I.R.C.P. 12(h)(3).

Touching again on the pertinent provisions of Public Law 280 that "[n]othing ... shall confer *jurisdiction* upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such [trust] property or any interest therein," 25 U.S.C. § 1322(b) (emphasis added), state courts simply do not have jurisdiction to determine the ownership or right to possession of trust property. Contrary to the Court's belief that there is no applicable case law, the United States Supreme Court has decided the question of the status of permanent improvements made on Indian trust property. The Supreme Court stated:

"Looking at the object to be accomplished by allotting Indian lands in severalty, it is evident that Congress expected that the lands so allotted would be improved and cultivated by the allottee. But that object would be defeated if the improvements could be assessed and sold for taxes. The improvements to which the question refers were of a permanent kind. While the title to the land remained in the United States, the permanent improvements could no more be sold for local taxes than could the land to which they belonged. Every reason that can be urged to show that the land was not subject to local taxation applies to the assessment and taxation of the permanent improvements.

"... The fact remains that *the improvements here in question are essentially a part of the lands,* and their use by the Indians is necessary to effectuate the policy of the United States." *United States v. Rickert,* 188 U.S. 432, 442, 23 S.Ct. 478, 482, 47 L.Ed. 532 (1903) (emphasis added).

This rationale clearly applies to jurisdiction granted to the states by Public Law 280.[2]

---

**2.** Trust property has more recently been defined as consisting of "all real property held in trust for tribes or individuals, the natural resources thereon, crops planted, income generated and lands purchased with such income

as well as treaty protected rights." Task Force One, American Indian Policy Review Commission, Report on Trust Responsibilities and the Federal Indian Relationship; Including Treaty Review 178 (Comm.Print.1976).

Those policies and statutes which preclude a state from exercising jurisdiction over Indian trust lands cannot be readily divorced with respect to permanent improvements made thereon. One of the easily discernible purposes in denying states jurisdiction over trust lands is to protect Indians and Indian tribes from "local ill feeling [as] the people of the States where they are found are often their deadliest enemies." *United States v. Kagama,* 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886). To believe that the Congress would protect Indian lands but not the very homes thereon in which the Indians abide is unacceptable. To so allow, in my view, makes way for undesirable "checkerboarding" with state courts having no jurisdiction to determine ownership of the underlying land nevertheless purporting to rule upon the ownership of the improvements thereon. Such "checkerboarding" of jurisdiction within a reservation has not met with judicial favor.[3]

B. With respect to the two parcels of grazing land, the Court, on the premise the magistrate only allowed recompense to the non-Indian husband for the community funds used to purchase the trust property, holds that no prohibited adjudication as to "ownership or right to possession" of the property has occurred. The majority comes to this conclusion not on the basis of the countless authorities cited (which I read as holding to the contrary) but rather on the basis that:

> "Of most significance, however, is the fact that only one of the parties is Indian. It is clear that the non-Indian party has no *desire* to submit himself to the jurisdiction of the tribal court for the resolution of this dispute. We are cited to no authority indicating that under the present circumstances a non-Indian must submit himself to the jurisdiction of an Indian court *merely and solely because he married an Indian.*" (Emphasis added.)

The Court, so it may seem to the reader of its opinion, in effect, sees its resolution coming down to the nice question of racial preference. The non-Indian does not want to submit to tribal court jurisdiction, presumably because he feels he will not get a fair trial. The tribal court presumably will not give him a fair trial because he is a non-Indian; and this Court will not guide him to tribal court jurisdiction "merely and solely because he married an Indian." The question of race is irrelevant. The issue is nothing more and nothing less than a question of jurisdiction. If a given forum has no jurisdiction over the res, that a party "would rather be in Philadelphia" is irrelevant.

The Court's premise that this non-Indian should not be subjected to tribal court jurisdiction merely because he married an Indian is an erroneous conception of the law. It is the *situs* of the property and its trust nature which confers jurisdiction. In choosing to invest in property within the boundaries of a reservation, Mr. Sheppard submitted himself to tribal jurisdiction over controversies involving that property. Is it any different from his having married a Mexican national and in her name taken title to Mexican real property? I think not. Dispositive is not that he married an Indian, but that trust property within the reservation boundaries was acquired and title was taken in the name of Roma Sheppard.[4] Distinguishing this situation from the Mexican example is the additional factor that here Congress has told state courts that they do not have jurisdiction to adjudicate with respect to such properties. The Congress has not purported to so declare with respect to property situate in Mexico.

The Court may be successful in dodging this jurisdictional issue by holding, as it does, that, merely recompensing George

---

3. The policy against checkerboarding of jurisdiction was relied on by the United States Supreme Court in *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), in determining that land opened to non-Indian ownership remained Indian country within the terms of 18 U.S.C. § 1151.

4. An analogy can be made to a corporation which by "doing business" in a state thereby submits itself to the jurisdiction of that state's courts.

Sheppard for his share of the community funds used to purchase the trust property is not an "adjudication of property rights or interests therein." I am much in doubt. In making this award, the magistrate court necessarily determined that both parties owned the property, but being precluded from adjudicating trust property, did not take it from the wife, yet at the same time awarded the husband a commensurate credit.[5] Such amounts to an adjudication of or with respect to Indian trust property, and is forbidden.

In *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979), the Supreme Court in determining whether an offset against federal railroad retirement benefits was permissible stated that "[t]he pertinent questions are whether the right as asserted conflicts with the express terms of federal law and whether its consequences sufficiently injure the objectives of the federal program *to require non-recognition.*" 439 U.S. at 583, 99 S.Ct. at 809 (emphasis added). The Court using this analysis held that an offsetting award under the state's community property laws would upset the statutory balance struck by Congress and was therefore improper.

This *holding* was reaffirmed by the Supreme Court in *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), in which it held that application of community property provisions to military retirement pay threatened grave harm to clear and substantial federal interests, and thus, federal law precluded state courts from dividing military nondisability retired pay pursuant to state community property laws.[6]

The federal interest in preserving tribal sovereignty free from state interference precludes state courts from making such a property distribution as was here done. " '[T]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.' *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945). This policy was first articulated by this Court 141 years ago [by] Mr. Chief Justice Marshall [in] *Worcester v. Georgia,* 6 Pet. 515, 557, 8 L.Ed. 483 (1832)." *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 169, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129, 133 (1973).

The federal interest in controlling Indian affairs was acknowledged by this very Court in *Boyer v. Shoshone-Bannock Tribes,* 92 Idaho 257, 260, 441 P.2d 167, 170 (1968), where it stated:

"It has been long and widely held that Congress has exclusive and plenary power to legislate with reference to the various Indian tribes. . . . Such exclusive federal jurisdiction is subject to no diminution by the states in the absence of specific congressional grant of authority to the states to act . . . .

"As a corollary to federal sovereignty it is clear that state law has no force and effect, except as granted by federal law,

---

5. The Court declares that:
"[T]he State assertion of jurisdiction over this cause of action does not infringe upon tribal sovereignty. The tribal code introduced in evidence in this case expressly recognizes the concept of community property. Law and Order Code of the Shoshone-Bannock Tribe of Indians § 2.2 (1972). Thus, application of community property principles alone does not offend tribal sovereignty." Accepting, *arguendo,* that there is no offending of tribal sovereignty, the fact still remains that a state court is without jurisdiction. The fact that the tribe recognizes community property concepts does not mean that it necessarily recognizes the same community property concept as does Idaho or that it interprets its provisions in the same manner as do our courts. The majority's analysis could be easily extended to

allow state courts to adjudicate in *any* area in which tribes have *adopted* laws *similar* to our own. Such a result has never been contemplated by Congress and is on extremely tenuous ground.

6. There may be some concern that the Court today may be taking comfort from its own recent precedent in *Rice v. Rice,* 103 Idaho 85, 645 P.2d 319 (1982), wherein it conceded the binding effect of *McCarty,* but nonetheless directed a second go-around on dividing the community property so as to arrive at a "just" division—notwithstanding that on the appeal there was no such proposition of readjustment involved or urged. 103 Idaho at 88, 645 P.2d at 323 (Bistline, J., dissenting on that particular point).

within the territory of an Indian tribe in matters affecting Indians." (Citations omitted.)

The federal interests in protecting tribal lands from state intrusion are such that states have been prohibited from treating with the Indians for the purchase, grant, lease, or other conveyance of Indian lands (Non-Intercourse Act, 25 U.S.C. § 177), from imposing taxes on income generated from reservation lands (*McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)), from applying zoning regulations to trust property (*Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir.1975)), from assessing personal property taxes within a reservation (*Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976)), and from determining the rights to proceeds from oil leases on trust land (*Ollestead v. Native Village of Tyonik,* 560 P.2d 31 (Alaska 1977), *cert. denied,* 434 U.S. 938, 98 S.Ct. 426, 54 L.Ed.2d 297 (1977)). While the above authority is representative of the strong federal interest in protecting tribal lands from state intrusion, it is far from exhaustive. Just as there exists a strong federal interest in preserving intact employees' military and railroad retirement benefits, so there is an even stronger interest in protecting the land base of the Indians free from state interference. Since application of state community property law conflicts with such federal interests, federal law preempts the area; state law may not be applied, directly or indirectly. *Wissner v. Wissner,* 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950).

C. Although I do agree that the cattle venture is not specific property held in trust or subject to a restriction against alienation, I cannot concur in the majority's determination that the magistrate correctly applied Idaho community property law in allocating the property involved; suspect is the refusal to apply 25 U.S.C. § 181:

> "No white man, not otherwise a member of any tribe of Indians, who may on and after August 9, 1888, marry an Indian woman, member of any Indian tribe in the United States, . . . shall by such marriage acquire any right to any *tribal property, privilege, or interest whatever* to which any member of such tribe is entitled." (Emphasis added.)

This provision would prevent George Sheppard from acquiring any rights to any privileges Roma Sheppard was entitled to by virtue of her tribal membership. As discussed *infra,* Roma Sheppard, by virtue of her tribal membership was entitled to apply for tribal loans. It is clear that only tribal members are eligible to receive tribal loans. By declaring that property purchased with tribal loans is community property and may be divided by the parties, the Court may be guilty of circumventing the terms of the statute. The Court reasons that because this statute was intended to protect against white men marrying Indian women for their "head-rights," and, because "head-rights" are not here involved, the statute is inapplicable. Upon several readings of the statute, I fail to ferret out any language so restricting this statute's applicability. To the contrary, the statute *expressly* applies whenever any "tribal property, privilege or interest whatever to which any member of such tribe is entitled," is involved. An elementary rule of statutory construction, and one which the Court should not feel free to ignore at its pleasure, is that the clear and express language of a statute cannot be abrogated by statements made in congressional debates during the bill's enactment. 2A Sutherland, Statutory Construction §§ 45.02, 46.04 (1973). If the law when enacted was intended to apply only to "head-rights", limiting language to that effect should have been used rather than the all-encompassing language which the statute contains.

The Court also refuses to apply this provision based on its determination that the statute was only intended to prohibit white men from "acquiring any right in '*tribal* property, privilege or interest.'" Only by creative and selective reading is the Court thus able to distinguish *tribal* property from individually held trust property and thereby conclude that no *tribal* property is here involved. The Court might conclude

otherwise were it to continue reading beyond the word "interest" and take into account the remainder of the sentence which goes on to add: "to which any member of such tribe is entitled." It would seem that this language would not have been used if the prohibition was not intended to encompass individual as well as tribal property. The Court's fragmented reading leads to an interpretation which flies in the face of the manifest intent of the Act—to prevent a non-Indian from reaping the benefits accorded tribal members by the expedient of marrying an Indian woman. The Court would constrain this Act's application to involvement with tribal as opposed to individual trust property. As a matter of common sense, it would seem that if Congress had intended to protect only the tribe as opposed to its individual members, it would have so worded the Act. That Congress would protect the presumably stronger class over the weaker individual from avaricious non-Indians is extremely doubtful. The very purpose in protecting trust property from falling into white ownership is defeated by such a limitation as the Court today imposes.[7]

It was established at trial that $14,000 of monies borrowed from Indian children and $23,000 obtained by Roma Sheppard as a loan from the Shoshone-Bannock tribal lending agency mainly financed the cattle operation. The Court concludes that her loan and the cattle obtained with the loan are community property because it determines that "[t]he lending agency's action in requiring respondent's [George Sheppard's] security demonstrates that it chose not to rely on the separate credit of appellant [Roma Sheppard]. Since the loan was obtained on the credit of both parties, *i.e.,* the community, it cannot have been appellant's separate property." This is difficult to comprehend. Although George Shep-

---

7. The magistrate refused to apply 25 U.S.C. § 181 because he "concluded that Idaho law will be applied because *this Federal statute has been ignored largely* the last many years by the Courts, and since Congress gave the States concurrent jurisdiction over 'domestic relations' to give credence to Sec. 181 does in effect give the Indians preferential treatment and privileges—*a result certainly not intended.*" (Emphasis added.)

Exercising appellate review, the district court picked up and expanded on this theme. The court stated in its memorandum and order that: "There is a presumption in Idaho law that property acquired during marriage is community property. Appellant argues, however, that certain federal laws overcome this presumption and prohibit respondent from acquiring an ownership interest in tribal trust property. Appellant cites 25 U.S.C. Sec. 194 and 25 U.S.C. Sec. 181 as his authorities. An initial reading of these sections would seem to sustain appellant's position. However, one must note that these laws were passed, one in 1834 and the other in 1888 and *in recent times have been basically ignored* and I am satisfied, if challenged, would, under present day holdings, be a *violation of the equal protection clause of the Federal Constitution.* In order to be upheld, such discriminating laws must serve a compelling government interest and I am satisfied that these statutes would not survive such a test." (Emphasis added.)

Justice Shepard, writing for the majority in turn also questions the constitutionality of this statute "in light of gender based equal rights protections." Indians are not just a group of people who live in this country who happen to be of another race. They are a separate and distinct *nation.* One may not blindly apply the same rules of analysis in construing enactments for the benefit of Indians as one does statutes of general applicability. The Supreme Court in *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), held that Indian employment preference statutes were not unconstitutionally discriminatory. The reasoning it used is particularly pertinent in this case.

"Resolution of the instant issue turns on the unique legal status of Indian tribes under federal law and upon *the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status,* to legislate on behalf of federally recognized Indian tribes. The *plenary* power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself. Article 1, § 8, cl. 3, provides Congress with the power to 'regulate Commerce * * * with the Indian Tribes,' and thus, to this extent, singles Indians out as a proper subject for separate legislation. . . .

. . . .

". . . As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 552–55, 94 S.Ct. at 2483–85 (emphasis added).

pard was required to sign the securing documents as Roma's spouse, it was only Roma Sheppard's tribal membership which provided entitlement to the loan,[8] and as a foreigner to the tribe, can it be said that he was any more than an accommodation endorser? I would think not. Should George Sheppard be elevated to a co-ownership which is prohibited? Again I would think not. The cattle business venture centered around cattle purchased with funds obtained by an Indian, in her name, from an Indian lending agency, sustained by grass growing on Indian trust property, the titular ownership of which was vested in an Indian.

---

8. In a letter to George Sheppard the Acting Superintendent of the Bureau of Indian Affairs, Fort Hall Agency, stated that "You [George Sheppard] were not required to sign the loan application and subsequent renewals because you were not an enrolled member of the Shoshone-Bannock Tribes and eligible for loans, you were requested to execute all securing documents as the spouse." Letter from Acting Superintendent Deward Uspot, Fort Hall Agency, Bureau of Indian Affairs to George Sheppard (November 10, 1977).